HOLMES, Circuit Judge,
dissenting.
The Stolen Valor Act makes it a crime for a person to “falsely represent ] himself or herself, verbally or in writing, to have been awarded” any congressionally authorized military decoration or medal. 18 U.S.C. § 704(b). Offenders face up to six months in prison, a penalty that doubles to one year if the false representation concerns certain medals, including the Congressional Medal of Honor, the Silver Star, and the Purple Heart. See id. § 704(c), (d). On its face, the Act criminalizes the bare utterance of a false statement of fact. The majority holds that such statements— at least when made knowingly and with an intent to deceive — are categorically beyond the protective universe of the First Amendment. In contrast, I believe that the First Amendment generally accords protection to such false statements of fact. Consequently, because it is a content-based restriction on speech, the Stolen Valor Act must satisfy strict scrutiny. This it cannot do. I would hold that the district court was correct in striking down the Act as unconstitutional. Therefore, on this basis, I must respectfully dissent.
In Part I, I summarize the relevant factual and procedural background. In Part II, I express my concerns regarding the majority’s constitutional-avoidance analysis and discuss the Supreme Court’s First Amendment jurisprudence, with a specific focus on the Court’s recognition of certain categories of unprotected speech. I conclude that the Court has not held that false statements of fact (even those knowingly made with an intent to deceive) comprise a unitary category of unprotected speech, but rather has excepted from the First Amendment’s protections only a discrete subset of false factual statements— that is, falsehoods that either cause, or pose a significant risk of causing, injury. The false statements proscribed by the Stolen Valor Act encompass much more and do not require injury or the risk of it.
In Part III, I review the common-law and statutory treatment of false statements of fact throughout our nation’s history, including around the time that the First Amendment was adopted, and conclude that it supports my view that false statements of fact — absent injury or a significant risk of it — were not subject to legal sanction. In Part IV, I detail some of my specific concerns regarding the majority’s analysis and in particular conclude that (1) the majority’s so-called “breathing space” inquiry turns customary First Amendment analysis on its head, by obliging the speaker in the context of a content-based speech restriction, as here, to justify after the fact why his or her speech should not be regulated; and (2) despite the majority’s contrary assertions, its breathing space analysis, in operation, is the kind of balancing test that the Supreme Court has condemned and is at odds with First Amendment values. In Part V, I detail why the Stolen Valor Act cannot be construed to target injurious falsehoods and, therefore, it cannot be held, at its core, to proscribe speech that falls within the ambit of a categorical exception to the First Amendment’s protections. Finally, in Part VI, having concluded that the speech targeted by the Stolen Valor Act is protected by the First Amendment, I apply strict scrutiny to the Act because it is a content- *1171 based restriction. I assume without deciding that the government’s interests are compelling, but conclude that the Act is neither narrowly tailored to the asserted interests nor necessary to achieve them. Accordingly, the Act cannot withstand strict scrutiny, and I conclude that it is therefore unconstitutional. I would hold that the district court’s judgment should be affirmed.
I.
Defendant-Appellee Rick Glen Strandlof is the founder of a veterans organization called the Colorado Veterans Alliance. In connection with his activities for the group, Mr. Strandlof used the alias “Captain Rick Duncan,” and often spoke of his “military career.” He claimed to have graduated from the Naval Academy, risen to the rank of captain in the United States Marine Corps, served three tours of duty in Iraq, and been injured by an improvised explosive device in Fallujah. For his purported sacrifice and service, Mr. Strandlof also claimed to have been awarded both the Purple Heart and the Silver Star.
Colleagues at the veterans group eventually became suspicious of Mr. Strandlof s claims. Following some basic inquiries, they were able to uncover that Mr. Strandlof had neither served in the military nor received the aforementioned medals. They subsequently reported his misrepresentations to the Federal Bureau of Investigation (“FBI”), which conferred with military officials to confirm that these claims were, in fact, fabrications. In an interview with FBI agents on May 13, 2009, Mr. Strandlof admitted to never serving in the military and to misrepresenting himself as a wounded veteran during his management of the Colorado Veterans Alliance. Subsequently, he was charged in a five-count information for violating the Stolen Valor Act, 18 U.S.C. § 704(b).[1] The Act provides in full:
Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both.
Id. The Act doubles the penalties where the claims pertain to certain specified medals, including the Purple Heart and the Silver Star. See id. § 704(d).
On December 2, 2009, Mr. Strandlof moved to dismiss the information, arguing that the Act is unconstitutional under the First Amendment. After entertaining a full round of briefing, the district court granted the motion to dismiss, finding the statute to be facially unconstitutional. United States v. Strandlof, 746 F.Supp.2d 1183, 1185 (D.Colo.2010). In so doing, the court rejected the government’s contention that “admittedly false statements enjoy no First Amendment [protection] at all,” finding it contrary to “well-established First-Amendment doctrine.” Id. at 1186. Relying on the Supreme Court’s recent decision in United States v. Stevens, — U.S. -, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010), the district court reasoned that the broad category of “admittedly false statements” was not within the “limited universe of ‘well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.’ ” Id. *1172 at 1186-87 (quoting Stevens, 130 S.Ct. at 1584). It also warned that the government’s position that the First Amendment protected false statements of fact only when necessary to protect “speech that matters” was troubling because it “invite[d] [the government] to determine what topics of speech matter enough for the citizenry to hear,” id. at 1186 (internal quotation marks omitted), and it resembled the “ad hoc calculus of costs and benefits” that the Supreme Court had specifically rejected in Stevens as a “free-floating test for First Amendment coverage” that was “startling and dangerous,” id. at 1187 (quoting Stevens, 130 S.Ct. at 1585-86) (internal quotation marks omitted).
Finding that false statements of fact were not generally excluded from the First Amendment’s protection and that the Act was a content-based regulation of speech, the district court then applied strict scrutiny and invalidated the Act. Id. at 1188-89. The court reasoned that, although the government asserted that the Act is “intended to preserve the symbolic significance of military medals,” this was hardly a “sufficiently compelling [interest] to withstand First Amendment scrutiny,” especially in light of the Supreme Court’s jurisprudence regarding flag burning. Id. at 1189 (citing Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)). Moreover, the district court found that the government’s claim that “[diluting the meaning or significance of [the] medals ... could impact the motivation of soldiers to engage in valorous, and extremely dangerous, behavior on the battlefield” was “wholly unsubstantiated,” “shocking, and indeed, unintentionally insulting to the profound sacrifices of military personnel the [Act] purports to honor.” Id. at 1190 (first alteration in original) (quoting Gov’t Resp. to Amicus Br. of Rutherford Inst, at 12 (Dist.Ct.Dkt.# 31-3)) (internal quotation marks omitted). It concluded, therefore, that because the government lacked a compelling interest sufficient to justify a content-based restriction on speech, the Act was unconstitutional.[2] See id. at 1192. This appeal followed.
II.
There is little dispute that the Stolen Valor Act operates as a content-based restriction on speech. The Act punishes “false[] representations]” of having received a military medal. 18 U.S.C. § 704(b). It therefore restricts speech based on its content and subject matter, Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 530, 536, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), and based on disapproval of “the message it conveys,” Hill v. Colorado, 530 U.S. 703, 719,120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)) (internal quotation marks omitted). This makes the Act “presumptively invalid, and the Government bears the burden to rebut that presumption.” Stevens, 130 S.Ct. at 1584 (quoting United States v. Playboy Entm’t Grp., Inc., 529 U.S. 803, 817, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)) (internal quotation marks omitted). Generally, this would require the government to show that the Act is necessary to achieve a compelling governmental interest and is narrowly tailored to that end. See Brown v. Entm’t Merchs. Ass’n, — U.S.-, 131 S.Ct. 2729, 2738, 180 L.Edüd 708 (2011).
*1173 However, certain “historic and traditional categories” of speech are amenable to content-based restrictions without the government having to satisfy this exacting standard. Stevens, 180 S.Ct. at 1584 (quoting Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 127, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (Kennedy, J., concurring in the judgment)) (internal quotation marks omitted). These categories, “long familiar to the bar,” id. (quoting Simon & Schuster, 502 U.S. at 127, 112 S.Ct. 501 (Kennedy, J., concurring in the judgment)) (internal quotation marks omitted), are “well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem,” id. (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)) (internal quotation marks omitted). The fundamental dispute in this case— between the parties and between the majority and me — centers on whether false statements of fact constitute such a category.
A.
Before addressing that question head-on, I feel obliged to confront the majority’s attempt to narrow the scope of the Stolen Valor Act under the banner of constitutional avoidance. “The Supreme Court,” says the majority, “requires we read an act of Congress narrowly, so as to avoid constitutional problems.” Maj. Op. at 1154. While we are indeed under a duty to construe “ambiguous statutory language” so as “to avoid serious constitutional doubts,” FCC v. Fox Television Stations, Inc., 556 U.S. 502,129 S.Ct. 1800, 1811,173 L.Ed.2d 738 (2009), we exercise that duty only when a statute is “readily susceptible” to a limiting construction, Stevens, 130 S.Ct. at 1592 (quoting Reno v. ACLU, 521 U.S. 844, 884, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997)) (internal quotation marks omitted). We should not “rewrite a ... law to conform it to constitutional requirements.” Reno, 521 U.S. at 884-85, 117 S.Ct. 2329 (quoting Virginia v. Am. Booksellers Ass’n, Inc., 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988)) (internal quotation marks omitted).
The majority finds that the Stolen Valor Act is “limited in two important ways.” Maj. Op. at 1154. First, it says that the statute “contains a scienter element, which operates to criminalize only knowingly false statements about receiving military awards.” Id. at 1155. Despite the fact that the Act does not, on its face, require that a false statement be uttered knowingly, I am comfortable with this aspect of the majority’s limiting construction. See Staples v. United States, 511 U.S. 600, 605, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (imposing a knowledge requirement on a criminal statute otherwise silent as to mens rea).
However, in the context of imposing this first limitation, the majority actually goes further. It effectively imposes an additional constraint on the scope of the statute by reading into § 704(b)’s reference to “false[] representation]” a requirement that the speaker have a “specific intent to deceive.” Maj. Op. at 1155. Whence this limitation? Certainly not the statutory text, which says not a word about intent (much less deception). Nor can it be said that knowledge and intent to deceive are conterminous mens-rea concepts. The Model Penal Code treats intent (what it calls “purpose”) and knowledge as separate states of mind, see Model Penal Code § 2.02, as do many modern criminal codes, see Wayne R. LaFave, Substantive Criminal Law § 5.2 n.12 (2d ed.2003). Congress, too, recognizes the distinction. A number of federal false-statement statutes *1174 set forth knowledge of falsity and intent to deceive as separate prerequisites to liability. See, e.g., 10 U.S.C. § 907; 15 U.S.C. § 78jjj(d)(l); 18 U.S.C. § 842; 18 U.S.C. § 922(a)(6); 18 U.S.C. § 1033(a)(1); 42 U.S.C. § 408(a)(6).[3]
Because Congress knows how to impose an intent requirement when it wants to, the majority’s grafting of an intent-to-deceive element onto the Stolen Valor Act must be viewed as an exercise in revision, not interpretation. See Holder v. Humanitarian Law Project, — U.S. -, 130 S.Ct. 2705, 2717-18, 177 L.Ed.2d 355 (2010) (declining to construe a criminal statute, which already contained a knowledge requirement, to contain an additional intent element, even if doing so would have avoided a First Amendment problem). Thus, even though I am comfortable with the majority’s claimed first limitation on the Act — imposing a knowledge requirement — I take exception to its attempt at the same time to map onto the statute a distinct mens-rea element of intent to deceive.
All this might go unmentioned, except that the majority’s novel addition to the statute does some heavy lifting, supporting what the majority calls its second (in reality, the third) limitation on the Act relating to “any satirical, rhetorical, theatrical, literary, ironic, or hyperbolic statements,” which the majority says “qualify as protected speech.” Maj. Op. at 1155. Specifically, the majority posits: “The Act’s requirement that false statements be made with an intent to deceive ... would not allow the government to prosecute individuals for making ironic or other artistically or politically motivated statements.” Id. Even assuming, arguendo, that the Act contains a “requirement” that the speaker have an intent to deceive, this conclusion does not logically follow.
Intentionally deceptive falsehoods and “ironic, dramatic, diplomatic, and otherwise polite speech,” id., are not the mutually exclusive categories that the majority conceives them to be. After all, the little white lie and the children’s fairy tale (think Santa Claus) are designed to deceive. Artistic expression, too, may employ intentional deception. Consider an uplifting example: Parson Weems’s tall tale about young George Washington’s refusal to tell a tall tale. See M.L. Weems, The Life of George Washington 13-14 (Phila., Joseph Allen 1833). The biographical anecdote, in which the young Washington allegedly confessed to taking a hatchet to the family’s cherry tree because he “c[ould]n’t tell a lie,” see id. at 14, is by all accounts a falsehood, despite Weems’s insistence that it was “too true to be doubted,” id. at 13.[4] But while the good parson may have traded on a fib to promote the virtue of honesty — that is, knowingly made a false factual statement with intent to deceive — we do not value the virtue, nor the fib, any less. In fact, the tale is a fixture of our national mythology.
The point here is simple: Some intentional deceptions may indeed be tools for expressing the “ironic,” the “artistic[ ],” the “politically motivated,” the “dramatic,” and the “polite.” See Maj. Op. at 1155. In other words, intentionally deceptive speech and such matters are not mutually exclusive. I am not convinced, then, that *1175 engrafting onto the Stolen Valor Act an intent-to-deceive requirement allays constitutional doubt and assures any firmer footing on the “slippery slope” that the majority recognizes — a slope down which “Congress could criminalize an appallingly wide swath,” id, of speech that is ordinarily thought to lie at the heart of the First Amendment. See id.[5]
Notwithstanding my concerns regarding the majority’s constitutional-avoidance analysis, I have evaluated the First Amendment validity of the Stolen Valor Act with the majority’s limiting interpretation in mind. Alas, even assuming that the majority’s interpretation is permissible, in my view, the Act does not pass constitutional muster. In sum, I believe that the speech targeted by the Act does not fall within a historically unprotected category and the Act does not survive strict scrutiny.
B.
While the Supreme Court and individual Justices have often undertaken to enumerate the categories of unprotected speech, constructing a canon would be a difficult task. The lists that appear in the Court’s opinions are incomplete and do not employ a common vocabulary.[6] On several occasions, particular types of false statements have been listed. See Stevens, 130 S.Ct. at 1584 (“defamation” and “fraud”); R.A.V., 505 U.S. at 383, 112 S.Ct. 2538 (“defamation”); Bose Corp., 466 U.S. at 504, 104 S.Ct. 1949 (“libelous speech”); Cent. Hudson Gas & Elec. Corp., 447 U.S. at 592-93, 100 S.Ct. 2343 (Rehnquist, J., dissenting) (“group libel” and “false and misleading commercial speech”). However, the Court has never listed the “false statement of fact” as an unprotected category unto itself.
My colleagues in the majority nevertheless believe that false statements of fact— at least when knowingly made, with an intent to deceive — are part of the canon of unprotected speech because the Supreme Court has repeatedly recognized that “there is no constitutional value in false statements of fact.” Gerbz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). To be sure, a *1176 string of Supreme Court cases contain dicta to this effect.[7] For two related reasons, however, I do not think these cases stand for the proposition that, without more, bare falsehood — even if knowingly uttered, with an intent to deceive — is categorically beyond the First Amendment’s heightened protections.
First, the Court’s pronouncements concerning false statements have come in the context of more narrow types of false statements, such as defamation and other speech torts, see, e.g., Falwell, 485 U.S. at 52, 108 S.Ct. 876; fraud, see Telemarketing Assocs., 538 U.S. at 612, 123 S.Ct. 1829; and false commercial speech, see Va. State Bd. of Pharmacy, 425 U.S. at 771, 96 S.Ct. 1817. Second, and relatedly, despite the Court’s repeated dicta concerning false statements, it has never read its own precedent as establishing a unitary, all-encompassing category of false statements that are excepted from the First Amendment’s protections. Rather, the Court has focused on false statements as they arise in discrete legal contexts. For example, Stevens, one of the most recent cases providing a list of unprotected speech, enumerates “defamation” and “fraud” separately and cites different cases for each. See 130 5. Ct. at 1584. Other lists often include defamation or libel specifically, but no other type of false statement. See supra note 6. If it is the false factual statement generally that is unprotected, then it is surely puzzling not only that the Court has never said so over the past four decades, but also that it has repeatedly taken pains to enumerate particular types of false factual statements rather than advert to a unitary unprotected category — false factual statements. See Nike, Inc. v. Kasky, 539 U.S. 654, 664, 123 S.Ct. 2554, 156 L.Ed.2d 580 (2003) (Stevens, J., concurring in dismissal of writ of certiorari as improvidently granted) (noting that the Court’s dicta concerning false statements are “perhaps overbroad! ]”).
*1177 c.
If there is a common feature that binds together the types of false statements enumerated in the Supreme Court’s past lists, it is something more than mere falsehood. As the Court has reminded us often, bare falsity is not enough to strip a statement of constitutional protection. See Curtis Pub. Co. v. Butts, 388 U.S. 130, 152, 87 S.Ct. 1975,18 L.Ed.2d 1094 (1967) (plurality opinion) (“While the truth of the underlying facts might be said to mark the line between publications which are of significant social value and those which might be suppressed without serious social harm ..., we have rejected ... the argument that a finding of falsity alone should strip protections from the publisher.”); Time, Inc. v. Hill, 385 U.S. 374, 387, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (“Factual error ... [is] insufficient for an award of damages for false statements.... ”); New York Times Co. v. Sullivan, 376 U.S. 254, 273, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (“[F]actual error ... [does not] suffiee[ ] to remove the constitutional shield.... ”); see also Sullivan, 376 U.S. at 271, 84 S.Ct. 710 (“[Constitutional protection does not turn upon the truth____” (quoting NAACP v. Button, 371 U.S. 415, 445, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)) (internal quotation marks omitted)). Justice Roberts put it most eloquently in Cantwell v. Connecticut:
In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification ..., and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.
310 U.S. 296, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (Roberts, J.) (emphasis added).
If falsity alone is insufficient to “remove the constitutional shield,” Sullivan, 376 U.S. at 273, 84 S.Ct. 710, something more is required. While the Court has never explicitly said what that “something” is, one variable stands out as having significant explanatory power: the presence of, or a significant risk of, injury, be it to an individual or to the processes of government. Without exception, the false statements at issue in the Court’s cases have been those that involve an actual distinct harm or a significant risk of it, the prevention of which is a constitutionally cognizable governmental interest. See Telemarketing Assocs., 538 U.S. at 612, 123 S.Ct. 1829 (stating that “the First Amendment does not shield fraud” because “the government’s power to protect people against fraud has always been recognized in this country and is firmly established” (quoting Donaldson v. Read Magazine, Inc., 333 U.S. 178, 190, 68 S.Ct. 591, 92 L.Ed. 628 (1948)) (internal quotation marks omitted)); Gertz, 418 U.S. at 341, 94 S.Ct. 2997 (“The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood.”).[8] Justice Holmes illustrated this principle well:
*1178 The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.... The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.
Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919) (Holmes, J.); see also Garrison, 379 U.S. at 70, 85 S.Ct. 209 (holding that Louisiana’s criminal libel law was not “narrowly drawn” because it did not require a finding of “clear and present danger” and was not limited “to speech calculated to cause breaches of the peace”); Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766 (describing the categories of unprotected speech as “those which by their very utterance inflict injury or tend to incite an immediate breach of the peace”). Thus, if there is an unprotected category to be divined from the Court’s jurisprudence, it is comprised of a discrete subset of false factual statements — that is, the injurious falsehood.
III.
The conclusion that I derive from this survey of the Supreme Court’s false-statement jurisprudence is consistent with the guideposts that the Court has articulated for discerning categories of unprotected speech. Specifically, the teaching of Stevens and the Court’s earlier related cases is that, ordinarily for speech to be categorically excepted from the protections of the First Amendment, it generally must be “historically unprotected.” Stevens, 130 S.Ct. at 1586 (emphasis added); see also R.A.V., 505 U.S. at 383, 112 S.Ct. 2538 (referring to the categories as “traditional limitations”); Simon & Schuster, 502 U.S. at 127, 112 S.Ct. 501 (Kennedy, J., concurring in the judgment) (calling them “historic and traditional categories long familiar to the bar”).[9] The historical record supports the conclusions that I have drawn from the Supreme Court’s false-statement cases. Specifically, our legal traditions suggest that the “naked lie” — the knowingly false statement unattended by harmful consequence — is beyond the province of the law to punish, and that only the injurious falsehood has historically been subjected to legal sanction.
A.
Historically and at common law, lying, without more, was not considered a criminal offense. See 4 William Blackstone, Commentaries *41-42 (“The vice of lying, which consists (abstractedly taken) in a criminal violation of the truth, and therefore in any shape is derogatory from found morality, is not however taken notice of by our law, unless it carries with it some public inconvenience, as spreading false news; or some social injury, as slander *1179 and malicious prosecution, for which a private recompence is given.”); see also State v. Karel, 100 Fla. 388, 129 So. 703, 704 (1930) (“[A] mere naked lie, an improbable lie or an absurd or irrational assertion, or a mere idle tale, or a device so shallow as to be incapable of imposing upon any person, is not indictable.”); Commonwealth v. Shaver, 3 Watts & Serg. 338, 1842 WL 4918, at *3 (Pa.1842) (“[T]here are also many evil practices of which a man may be guilty, ... [such as] lying, which may be said to he at the root of almost all moral obliquity, for which he cannot be indicted or punished by law....”); Commonwealth v. Wilgus, 21 Mass. (4 Pick.) 177, 186 (1826) (“A mere naked lie may not be sufficient to sustain an indictment on this statute, for it is not the policy of government to punish criminally every wrong which is committed”). To be indictable, a lie had to occasion some public injury. See Commonwealth v. Sharpless, 2 Serg. & Rawle 91, 1815 WL 1297, at *8 (Pa.1815) (Yeates, J.) (“[A]lthough every immoral act, such as lying, etc., is not indictable, yet where the offence charged is destructive of morality in general; where it does or may affect every member of the community, it is punishable at common law.”); 4 Blackstone, supra, at *41-42. Thus, fraud tending to cause injury to the public was indictable. See People v. Stone, 9 Wend. 182, 188 (N.Y.Sup.Ct.1832) (“[I]n order to render a cheat or fraud indictable at common law, on the ground that it was effected by means of a false token,[10] the token must be such as indicates a general intent to defraud, and therefore is an inju ry to the public.” (emphases omitted)); cf. Lems v. Commonwealth, 2 Serg. & Rawle 551, 1816 WL 1579, at *1 (Pa.1816) (“It is not every cheat, indeed, which may be so punished; one may cheat another, by barely telling a lie, to deceive him in the quality of goods sold, & e.; such deception would not be subject to an indictment; but a cheat which affects the public is indictable.”).[11] Libel was also indictable because its written form and calumnious character tended to “cause a disturbance of the public peace.” State v. Avery, 7 Conn. 266, 1828 WL 77, at *3 (1828); see also 2 James Kent, Commentaries on American Law * 17 (New York, E.B. Clayton, 3d ed. 1836) (“[T]he law has accordingly considered [libel] in the light of a public as well as a private injury, and has rendered the party ... answerable to the state by indictment, as guilty of an offence tending directly to a breach of the public peace.”).
Spreading false news was also a crime at common law. 4 Blackstone, supra, at *149. The American colonies had laws to this effect, punishing any person “who shall wittingly and willingly make or publish any lie which may be pernicious to the common weal.” Larry D. Eldridge, Before *1180 Zenger: Truth and Seditious Speech in Colonial America, 1607-1700, 39 Am. J. Legal Hist. 337, 352 (1995) (quoting a 1645 Massachusetts statute) (internal quotation marks omitted). Over time, however, colonial prosecutions for this offense became rare; the preferred remedy was to combat falsehood with truth. See id. at 356 (“Increasingly, as the [seventeenth] century went on, colonial officials simply investigated rumors and did little except publicly declare them to be false.... ”).
In civil actions, liability also could not be founded on a false statement unless it caused the plaintiff injury. Thus, for civil fraud, “[a] mere naked lie — a falsehood— though told with intent to deceive, upon which nobody acts, and by which nobody is deceived, is not actionable.” Town of En-field v. Colburn, 63 N.H. 218, 1884 WL 3547, at *2 (1884); Irwin v. Sherril, 1 N.C. (Tay.) 99, 1799 WL 112, at *2 (N.C.Super.Ct.L. & Eq. 1799) (“So it is for telling a bare, naked lie, the truth or falsehood of which were alike unknown to the defendant; no action is maintainable; but where it is uttered by a person who, at the time, knew its falsehood, and a loss afterwards ensues to the plaintiff in consequence of it, an action will lie.”).[12] Similarly, a defamatory or libelous falsehood was by definition injurious. See Lyle v. Clason, 1 Cai. R. 581 (N.Y.Sup.Ct.1804) (“The basis of the action [for libel] is damages for the injury to character in the opinion of others.” (emphasis omitted)); 2 Kent, supra, at *16-17 (“A libel ... has been well defined to be a malicious publication, ... tending either to blacken the memory of one dead, or the reputation of one alive.... A malicious intent ..., and an injurious or offensive tendency, must concur to constitute the libel.” (footnote omitted)); see also Re *1181 statement (Second) of Torts § 559 (1977) (“A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him”). And where the falsehood did no harm — either because it was not published to a third person, did not refer to the plaintiff, or did not otherwise cause injury — there was no liability. See Miller v. Maxwell, 16 Wend. 9, 15-16 (N.Y.Sup.Ct.1836) (“[I]t is obvious that the publication must describe the plaintiff with sufficient certainty to enable his personal acquaintances, on reading it, to apply to him the slanderous imputations; if not, however gross the charges, it is no libel upon him....”); Thomas McIntyre Cooley, A Treatise on the Law of Torts 225 (Chi., Callaghan & Co., 2d ed. 1888) (“The reputation is not assailed, and cannot presumably be injured when the false charge is made only to the party himself.”); 3 William Blackstone, Commentaries *124 (“But mere scurrility, or opprobrious words, which neither in themselves import, nor are in fact attended with, any injurious effects, will not support an action [for defamation].”).[13]
B.
Several federal statutes in place at or around the time that the First Amendment came into force penalized false statements. The types of false statements penalized were few, but none is surprising. They are the types that continue to be subject to sanction today, without constitutional objection: perjury and false statements knowingly made to a government agency or concerning a matter within an agency’s jurisdiction. These statements injure, or perhaps more often pose a significant risk of injuring, governmental processes.
There was the proscription and punishment of perjury. See An Act for the Punishment of certain Crimes against the United States, § 18,1 Stat. 112, 116 (1790) (prescribing imprisonment and fines for “any person [who] shall wilfully and corruptly commit perjury ... on his or her oath or affirmation in any suit, controversy, matter or cause depending in any of the courts of the United States”). Relatedly, a 1798 federal statute authorized congressional officeholders to “administer oaths or affirmations to witnesses, in any case under their examination” and punished “any person [who] shall wilfully, absolutely and falsely swear or affirm, touching any matter or thing material to the point in question, whereto he or she shall be thus examined.” An Act to authorize certain Officers and other persons to administer oaths, §§ 1-2, 1 Stat. 554, 554 (1798).
False statements to the government were also subject to legal sanction. Some laws required a person to swear or affirm regarding a matter bearing on some area of federal regulation and criminalized the giving of a false oath or affirmation. See, e.g., An Act for the relief of persons imprisoned for Debt, § 3, 1 Stat. 482, 482 (1796) (prescribing criminal penalties for a bankrupt debtor’s swearing falsely with respect to his property); An Act concerning certain Fisheries of the United States, *1182 and for the regulation and government of the Fishermen employed therein, § 8, 1 Stat. 229, 232 (1792) (prescribing criminal penalties for falsely swearing that a ship was actually employed at sea in order to obtain a federal subsidy); An Act for Registering and Clearing Vessels, Regulating the Coasting Trade, and for other purposes, § 36, 1 Stat. 55, 65 (1789) (“That if any person or persons shall falsely make oath or affirmation to any of the matters herein required to be verified [relating to the federal registration of ships and vessels], such person or persons shall suffer the like pains and penalties, as shall be incurred by persons committing wilful and corrupt perjury... ,”).[14]
There was a third type of false statement punished in the early years of the Republic, embodied in the infamous Sedition Act of 1798. Criminal penalties were prescribed for “any person [who] shall write, print, utter or publish ... any false, scandalous and malicious writing ... against the government of the United States, ... with intent to defame the said government.” Sedition Act, § 2, 1 Stat. 596, 596 (1798). The Act expired by its terms in early 1801, id. § 4, 1 Stat. at 597, and the question of its constitutionality never reached the Supreme Court. However, it was roundly condemned at the time as violating the First Amendment, and that opinion “has carried the day in the court of history.” Sullivan, 376 U.S. at 275-76, 84 S.Ct. 710.
c.
The historical record regarding false-statement liability reveals a caution and prudence in subjecting false statements to legal sanction. The “naked lie,” though morally objectionable, was not legally punishable, and a false statement did not incur liability unless it occasioned some injury, whether private or public. See 4 Blackstone, supra, at *41-42. The early federal proscriptions on perjury and false statements to the government are consistent with a concern about public injury. Thus, if the historical record reveals any false-statement category long subject to regulation, it is, at a minimum, the injurious falsehood — that is, a false statement of fact that causes, or poses a significant risk of causing, harm.
The focus in our legal tradition on the injurious falsehood is entirely consistent with the Supreme Court’s false-statement jurisprudence. What the historical record demonstrates is that there is no unitary, all-encompassing false-statement-of-fact category that has been long subject to unobjected-to restriction. To the contrary, in the American tradition, the “naked lie” — i.e., the unadorned falsehood — is not subject to legal sanction.
IV.
Our legal tradition’s view of false-statement liability — a narrow one that is restricted to the injurious falsehood — deserves great weight in our constitutional analysis, not only because Stevens so in *1183 structs us, but also because the tradition has much to commend it. I therefore cannot agree with the majority that a knowingly false statement of fact (even one made with an intent to deceive) is inherently valueless and, therefore, undeserving of First Amendment protection.
A.
In the first place, as the Supreme Court has repeatedly recognized, false statements are “inevitable in free debate.” Hartlage, 456 U.S. at 60-61, 102 S.Ct. 1523 (quoting Sullivan, 376 U.S. at 271-72, 84 S.Ct. 710) (internal quotation marks omitted); Gertz, 418 U.S. at 340, 94 S.Ct. 2997; Time, Inc. v. Hill, 385 U.S. at 388, 87 S.Ct. 534; see also Cantwell, 310 U.S. at 310, 60 S.Ct. 900. Relatedly, disentangling the false from the true is often a task fraught with problems. Time, Inc. v. Pape, 401 U.S. at 286, 91 S.Ct. 633 (“The question of the ‘truth’ ... presents rather complicated problems.”); Sullivan, 376 U.S. at 271, 84 S.Ct. 710 (“Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth....”). As Justice Jackson noted well,
it cannot be the duty, because it is not the right, of the state to protect the public against false doctrine. The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.
Thomas v. Collins, 323 U.S. 516, 545, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (Jackson, J., concurring). Indeed, the notion that the marketplace of ideas provides a proving ground for truth necessarily assumes that error is part of the process. Sullivan, 376 U.S. at 279 n. 19, 84 S.Ct. 710 (“Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about ‘the clearer perception and livelier impression of truth, produced by its collision with error.’ ” (quoting John Stuart Mill, On Liberty 15 (Oxford, Blackwell 1947))); see also Dun & Bradstreet, Inc. v. C.R. Grove, 404 U.S. 898, 900, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971) (Douglas, J., dissenting from the denial of a writ of certiorari) (“[E]ven false statements perform an important function. Whether intentional, whether false, all opinions and allegations in this forensic community are catalytic elements which tend to cause us to react, to rethink, and to reply.” (emphases added)).
Second, false statements are not all of a piece. They run the gamut from harmful, to benign, to salutary. See United States v. Alvarez, 638 F.3d 666, 674-75 (9th Cir.2011) (Kozinski, C.J., concurring in the denial of rehearing en banc). In that sense, they are precisely like every other form of speech — biography, opinion column, academic article, or box-office hit, to name a few — that presumptively enjoys constitutional protection. See Stevens, 130 S.Ct. at 1591 (“Most of what we say to one another lacks religious, political, scientific, educational, journalistic, historical, or artistic value (let alone serious value), but it is still sheltered from government regulation.” (emphasis omitted) (internal quotation marks omitted)). If “(w)holly neutral futilities ... come under the protection of free speech as fully as do Keats’ poems or Donne’s sermons,” Cohen, 403 U.S. at 25, 91 S.Ct. 1780 (alteration in original) (quoting Winters v. New York, 333 U.S. 507, 528, 68 S.Ct. 665, 92 L.Ed. 840 (1948) (Frankfurter, J., dissenting)), then surely the little white^ lies (even those knowingly told and designed to deceive) that season *1184 our speech, like a beneficent salt, and preserve the grace and dignity of human relationships, are likewise sheltered.
B.
Thus, I am troubled by the majority’s conclusion that false statements of fact— even those that are knowingly made, with an intent to deceive — are categorically outside the protective walls of the First Amendment and are given shelter only as a means to some other end, namely, protecting other “speech that matters.” According to the majority, this so-called “breathing space” analysis is well-grounded in Supreme Court precedent. Maj. Op. at 1159 (“Thus, the Supreme Court has expressly stated that, although laws punishing false statements must afford adequate breathing space to protected speech, knowingly false factual statements are not intrinsically protected under the First Amendment.”). I beg to differ. The majority’s analysis rests on little more than statements from the Court’s opinions that are selectively quoted and used out of context. At bottom, as the Ninth Circuit put it, “we [should] not [be] eager to extend ... statements] (often quoted, but often qualified) made in the complicated area of defamation jurisprudence into a new context in order to justify an unprecedented and vast exception to First Amendment guarantees.” United States v. Alvarez, 617 F.3d 1198,1208 (9th Cir.2010).
It is true, of course, that what the Court has said in dicta is entitled to great weight and binds us “almost as firmly as ... the Court’s outright holdings.” United States v. Langford, 641 F.3d 1195, 1198 n. 2 (10th Cir.2011) (quoting United States v. Serawop, 505 F.3d 1112, 1122 (10th Cir.2007)) (internal quotation marks omitted). That does not, however, negate our obligation to investigate and determine what the Court has actually said. In this vein, the Court has cautioned us that dicta in its First Amendment jurisprudence should be taken “in context.” See R.A.V., 505 U.S. at 383, 112 S.Ct. 2538. It has also warned against simplistic reliance on statements found in its past opinions. See Garrison, 379 U.S. at 67 n. 3, 85 S.Ct. 209. Finally, let us be honest: Nothing in the Supreme Court’s First Amendment jurisprudence affirmatively controls this case. Our judicial task, then, consists of more than quote mining. Establishing for the first time a new category of unprotected speech, as the majority does, for knowingly false statements of fact — something the Supreme Court has never done — must hang on more than the slender thread that the majority supplies.
So it is worthwhile, I think, to step back and consider the consequences of the majority’s decision. Henceforth, every falsehood — no matter where uttered, no matter how inconsequential — may be regulated, even criminally punished, so long as it is knowingly made, with an intent to deceive. The government need not come forward with any compelling purpose, much less a means narrowly tailored to achieve it. The awesome breadth of this censorial power is staggering. The slightest mendacity — “I’m busy tonight,” “I don’t have cash on me,” “I used to walk to school, uphill, through three feet of snow” — may now be subject to criminal sanction unchecked by the First Amendment, unless after the fact the speaker can demonstrate that protecting his utterance is somehow necessary to protect other “speech that matters,” or unless his speech falls into the majority’s vaguely defined safe harbor because it is ironic, rhetorical, artistic and the like. This is strange terrain for the First Amendment.
To begin with, the majority turns customary First Amendment analysis on its head. It is rudimentary, so I had thought, that content-based speech restrictions are *1185 presumptively unconstitutional and that the government is charged with justifying them. See Stevens, 130 S.Ct. at 1584. The government is required to show either that the restriction meets strict scrutiny, or that the speech falls into an identified category that warrants less rigorous review and that it satisfies the requirements of that review. See Brown, 131 S.Ct. at 2733, 2738. It is not the speaker’s burden to show why his speech should be unregulated. See Playboy Entm’t, 529 U.S. at 816, 120 S.Ct. 1878 (“When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.”).
Second, the majority’s holding invites precisely the sort of balancing test that earned the Court’s stern rebuke in Stevens. The notion that the government may regulate an entire category of speech unless speakers can demonstrate, to a court’s satisfaction, that the speech is of sufficient social importance is anathema to our First Amendment tradition.[15] See Stevens, 130 S.Ct. at 1585. Indeed, it is inimical to the concerns animating the First Amendment. See id. The point of the First Amendment was to do away with such balancing, to minimize to the vanishing point the government’s interference with citizens’ speech. Cohen, 403 U.S. at 24, 91 S.Ct. 1780 (“[The First Amendment] is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us.... ”)[16] Absent adherence to that constitutional principle, one of our most fundamental liberties would lie prostrate before the ever-pressing urgency of the moment, the vascillating sensibilities of the populace, and some legislators’ views on which utterances are and are not socially desirable. Our nation ratified the First Amendment precisely because we do not trust ourselves to strike the balance appropriately on a case-by-case basis. See Citizens United v. Fed. Election Comm’n, — U.S. -, 130 S.Ct. 876, 898, 175 L.Ed.2d 753 (2010) (“Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints.” *1186 (emphasis added)). To be sure, the First Amendment is “the very product of an interest-balancing,” District of Columbia v. Heller, 554 U.S. 570, 635,128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), but it is one that was done “by the people,” id., at the time of its adoption, see Stevens, 130 S.Ct. at 1585 (“The First Amendment’s guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs.”); see also Brown, 131 S.Ct. at 2759 n. 2 (Thomas, J., dissenting) (“The question is not whether certain laws might make sense to judges or legislators today, but rather what the public likely understood ‘the freedom of speech’ to mean when the First Amendment was adopted.”). Yet, the unacceptable risk of ease-by-case balancing is reconstituted in the majority’s newly minted breathing space analysis.[17]
I recognize, of course, that the Supreme Court has often described protection for false statements as being justified by the need to protect “speech that matters.” See Gertz, 418 U.S. at 341, 94 S.Ct. 2997. “But such descriptions are just that — descriptive.” Stevens, 130 S.Ct. at 1586.
They do not set forth a test that may be applied as a general matter to permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary, or so long as an ad hoc calculus of costs and benefits [in a First Amendment challenge to a statute] tilts in a statute’s favor.
Id. Gertz — the source of the “speech that matters” language — was concerned with a defamatory falsehood, and I have no doubt that that sort of falsehood, due to the injury it occasions, is categorically outside of the First Amendment’s heightened protections. However, the majority attempts through its breathing space analysis to extend Gertz outside of the context of injurious falsehoods, like defamation, and that is where its analysis falters.[18]
*1187 Perhaps worst of all, the majority’s rule invites a case-by-case consideration of the importance of speech only after the fact— specifically, only after the penal or prosecutorial forces of the State have arrayed against the speaker. No speaker could know his fate in advance. He would be left to hope that a court would find a sufficient link between his “valueless” false speech and some nebulous cluster of “important” speech, such that he might benefit from the First Amendment’s protection. I agree with Judge Smith, Alvarez, 638 F.3d at 673 (Smith, M., J., concurring in the denial of rehearing en banc): this would be a truly Kafkaesque world. See Gertz, 418 U.S. at 343^4, 94 S.Ct. 2997 (“[Case-by-case balancing] would lead to unpredictable results and uncertain expectations, and it could render our duty to supervise the lower courts unmanageable. Because an ad hoc resolution of the competing interests at stake in each particular case is not feasible, we must lay down broad rules of general application.”).
The constitutional infirmity of such after-the-fact burden-shifting is highlighted in two Supreme Court decisions. See Illinois ex rel. Madigan v. Telemarketing Assocs., Inc., 538 U.S. 600, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003); Riley v. Natl Federation of the Blind of N.C., Inc., 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In Riley, the Court confronted a state law prohibiting professional fundraisers, who were engaged in charitable solicitation, from retaining an “unreasonable” fee. 487 U.S. at 784,108 S.Ct. 2667. Fees exceeding thirty-five percent were deemed unreasonable unless the fundraiser could show on a ease-by-case basis either that the solicitation involved advocacy or information dissemination, or that, absent the higher fee, the charity’s ability to raise money or communicate would be significantly diminished. Id. at 785-86, 108 S.Ct. 2667. The law’s purpose was fraud prevention, and while the Court recognized the State’s substantial interest therein, it struck down the law as not narrowly tailored to that end. See id. at 792-93, 108 S.Ct. 2667.
The Court’s first conclusion was that a percentage-based fee measure lacked a sufficient nexus to the potential for fraud. See id. at 793,108 S.Ct. 2667. But, significantly for our purposes, the law “suffered] from a more fundamental flaw.” Id. It “require[d] the speaker to prove ‘reasonableness’ case by case based upon what is at best a loose inference that the fee might be too high.” Id. (emphasis added). The fundraiser bore the burden in each case to rebut the presumption of unreasonableness. Id. Furthermore, even if the fundraiser could show that its solicitation involved advocacy or the dissemination of information, that was not alone sufficient; it was “merely a factor that is added to the calculus submitted to the factfinder, who may still decide that the costs incurred or the fundraiser’s profit were excessive.” Id. The Court was not comforted, moreover, by the government’s assurance that standards for determining reasonable fundraising fees would be “judicially defined over the years.” Id. (citation omitted) (internal quotation marks omitted). “Speakers,” the Court said, “cannot be made to wait for ‘years’ before being able *1188 to speak with a measure of security.” Id. at 793-94,108 S.Ct. 2667.
In the interim, fundraisers will be faced with the knowledge that every campaign incurring fees in excess of 35% ... will subject them to potential litigation over the “reasonableness” of the fee. And, of course, in every such case the fundraiser must bear the costs of litigation and the risk of a mistaken adverse finding by the factfinder, even if the fundraiser and the charity believe that the fee was in fact fair. This scheme must necessarily chill speech in direct contravention of the First Amendment’s dictates.
Id. at 794, 108 S.Ct. 2667 (emphasis added).
Riley’s, lesson was reiterated in Telemarketing Associates, which involved a civil fraud action by the State of Illinois against certain fundraising organizations. The State’s complaint was brought pursuant to Illinois’s common law of fraud, under which, as the Court noted, “[f]alse statement alone” was insufficient for liability. 538 U.S. at 620, 123 S.Ct. 1829. Rather, the State was required to establish by clear and convincing evidence that a factual representation was knowingly false, was made “with the intent to mislead the listener,” and was successful in doing so (i.e., caused some injury). Id. These “[e]x-acting proof requirements ... provide[d] sufficient breathing room” for the First Amendment, the Court found, and it upheld the complaint as “properly tailored” to the State’s interest in protecting the public from fraud. Id. Significantly, the Court’s opinion contained the following discussion:
In Riley, this Court expressed concern that case-by-case litigation over the reasonableness of fundraising fees would inhibit speech.... The Court has long cautioned that, to avoid chilling protected speech, the government must bear the burden of proving that the speech it seeks to prohibit is unprotected. The government shoulders that burden in a fraud action.
Id. at 620 n. 9, 123 S.Ct. 1829 (emphasis added) (citations omitted).
If the First Amendment places the burden on the government and bars case-by-case balancing in an action for civil fraud, then a fortiori the First Amendment should operate in the same manner in a criminal action based upon a false statement of fact (even one knowingly made with an intent to deceive) — after all, in the latter type of action, significant social stigma and possibly liberty itself is at stake. See Reno, 521 U.S. at 872, 117 S.Ct. 2329 (stating that criminal penalties “pose[ ] greater First Amendment concerns” than civil regulations because “[i]n addition to the opprobrium and stigma of a criminal conviction, ... [t]he severity of criminal sanctions may well cause speakers to remain silent rather than communicate”). On this basis, I conclude that the majority’s breathing space review is actually a condemned balancing test by another name and, as such, ill-conceived.
V.
Based on the above review of the Supreme Court’s jurisprudence and the historical record, I conclude that the Stolen Valor Act may not be read as targeting speech that is categorically excepted from the First Amendment’s rigorous protections, unless it may be said that it targets injurious falsehoods — injurious either to one or more individuals or to governmental processes. Because I do not believe that it is susceptible to such a reading, I conclude that the Stolen Valor Act criminalizes protected speech and, because it is content-based, it is subject to strict scrutiny.
*1189 For analytical purposes, we might distinguish between two types of injury that false statements produce. The first is direct injury: injury caused by the very utterance of a false statement. Defamatory and other tortiously false speech are examples of directly injurious falsehoods. See Keeton, 465 U.S. at 776, 104 S.Ct. 1473 (“[Libelous statements] harm both the subject of the falsehood and the readers of the statement.” (emphasis omitted)); Time, Inc. v. Hill, 385 U.S. at 384 n. 9, 87 S.Ct. 534 (“[In false light invasion of privacy,] the primary damage is the mental distress from having been exposed to public view.”). Perjury, too, may exhibit this quality because it is thought to harm the “integrity of the legal system.” See United States v. Holland, 22 F.3d 1040, 1047 (11th Cir.1994) (“Perjury, regardless of the setting, is a serious offense that results in incalculable harm to the functioning and integrity of the legal system.... ”). The second form of injury is indirect, such that the falsehood does not itself do harm, but injury results when there is a subsequent act (or failure to act) — or a significant risk of the same — in reliance on the falsehood. Of this, fraud and false commercial speech are ready examples. See 2 Am.Jur.2d Fraud and Deceit § 23 (2011) (describing elements of fraud as including “action ... taken in justifiable reliance upon the representation”).[19]
The most glaring problem with the Stolen Valor Act is the absence of a nexus between the proscribed “false[ ] representation]” and any resulting injury. For three reasons, the Act is not an injurious-falsehood regulation: (1) By its terms, the Act does not require a showing that a defendant’s false statement of fact caused a particular injury (i.e., it does not contain an injury or harm element); (2) the Act plainly is not designed in a manner that is calculated to target any form of indirect injury; and (3) the government’s claim that the false claims that the Act proscribes inflict a generalized harm on the “reputation and meaning” of military awards is unpersuasive, notably because those claims are not sufficiently analogous to the kinds of speech that have been permissibly proscribed, without a particularized showing of harm.
A.
The sum and substance of the Stolen Valor Act is this: “Whoever falsely represents himself ... to have been awarded any [military] decoration or medal authorized by Congress ... shall be fined ..., imprisoned ..., or both.” 18 U.S.C. § 704(b). That language, on its face, does not require any demonstration that a defendant’s false statement concerning military medals or awards caused a specific injury. For example, the Act does not require a particularized showing of direct injury — i.e., proof of some nexus between a defendant’s false claim and the resulting diminution of the “reputation” and symbolic meaning of military awards. Nor does the Act oblige the government to establish that a defendant caused another person to detrimentally rely on his false statement (such as by voting for a defendant or donating to his cause)' — -i.e., to demonstrate an indirect harm. Consequently, even under the majority’s limiting construction (i.e., a mens rea of knowingly with intent to deceive), the Act still covers falsehoods that are patently harmless, such as Grand *1190 pa’s puffed-up war stories over Thanksgiving turkey.
B.
The Act plainly is not designed in a manner that is calculated to regulate an indirectly injurious falsehood. Apart from the lack of any facial requirement of indirect injury, the Act is not limited to situations in which a significant risk of such an injury is evident. An example by comparison may illustrate.
18 U.S.C. § 2074 makes it a crime to “knowingly issue[ ] or publish[ ] any counterfeit weather forecast or warning of weather conditions falsely representing such forecast or warning to have been issued or published by the Weather Bureau, United States Signal Service, or other branch of the Government service.” While this statute does not on its face require a nexus between a false weather report and a resulting indirect injury, the statute’s aim is evident: to prevent unscrupulous prevaricators both from inciting public panic through false warnings of inclement weather and from lulling the public into a false sense of security through deceptive assurances of sunny skies. Criminal punishment also seems particularly appropriate in this context because attempts to combat false weather reports may be ineffective (indeed, they may only sow confusion) and truthful reports may not arrive in time to undo damage already done. Notably, too, § 2074 contains limitations. In addition to a “counterfeit” forecast of weather conditions, the statute requires that the forecast be “issue[d] or publishe[d]” and that it falsely bear the government’s endorsement.
The Stolen Valor Act is insufficiently analogous to this kind of statute. False claims of military honor — even when knowingly made, with an intent to deceive — do not risk any imminent “breach of the peace,” such as a public panic. Cf. Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766 (characterizing unprotected speech as that which “tend[s] to incite an immediate breach of the peace”); Schenck, 249 U.S. at 52, 39 S.Ct. 247 (“The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic.”). And the Act is not limited to situations in which the risk of detrimental reliance is palpable, such as false claims at a fundraising event or in the context of charitable solicitations. Cf. Telemarketing Assocs., 538 U.S. at 612, 123 S.Ct. 1829 (“[Fraudulent charitable solicitation is unprotected speech.”).
C.
Rejecting the notion that statutes proscribing false statements must contain a harm element that must be proved in every case, the government contends that the false claims of military honor addressed by the Stolen Valor Act inflict a generalized harm and, more specifically, that “the cumulative effect of false claims undermines the reputation and meaning of the awards.” Aplt. Opening Br. at 21. In this regard, the government identifies obscenity and perjury as categories of speech that have been permissibly proscribed, though they do not “involve individualized harms.” Id. at 19. For the reasons that follow, however, I believe that the government’s arguments are unpersuasive.
First, as to the notion of generalized harm based on the purported cumulative effect of false claims, as previously noted, there is nothing in the Act’s text that limits its application to situations in which there is a significant risk of damage to the reputation and meaning of awards. The Act requires only that false statements concerning military awards be made. Thus, it is far from clear that there would *1191 be any appreciable harm in particular instances that could be cumulated to establish a generalized harm.
Furthermore, the government’s reliance on the example of obscenity is unavailing. Specifically, the government asserts that the kind of harm caused by false claims related to military honors, “like the harm caused by obscenity, is difficult to prove in an individual case,” thus “Congress may rely on the commonsense judgment that such speech is, in general, harmful.” Id. at 20. However, the analogy to obscenity is old hat. Government officials frequently invoke this analogy to justify speech restrictions, and the Supreme Court regularly rebukes it. See, e.g., Brown, 131 S.Ct. at 2734 (“Stevens was not the first time we have encountered and rejected a State’s attempt to shoehorn speech about violence into obscenity.”).
More to the point, the historical record — which provides a recognized, valuable guidepost in discerning categories of protected and unprotected speech, see Stevens, 130 S.Ct. at 1584 — makes the government’s analogy inapposite. Obscenity may be targeted without a particularized showing of harm because of our nation’s long-standing restrictions on obscene speech. See Roth v. United States, 354 U.S. 476, 482-84, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (reviewing obscenity laws pre- and post-dating adoption of the First Amendment and concluding that “implicit in the history of the First Amendment is the rejection of obscenity as utterly without redeeming social importance”); see also Paris Adult Theatre I v. Slaton, 413 U.S. 49, 61-62 & n. 12, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973). For First Amendment purposes, then, the relevant historical category that is lacking in protection is obscenity itself, not injurious obscenity. False-statement regulation, by contrast, has a different historical pedigree. The “naked lie” traditionally was not sanctionable, and legal consequences attached only if a false statement caused a particularized injury, or posed a significant risk of causing one. Thus, the relevant historical category that is lacking protection in this context is not false statements themselves, but rather only injurious false statements. In other words, particularized harm (or a significant risk of it) is part of the equation in the false-statement context, and not in the obscenity context, because history dictates that result. The government’s attempt to elide the distinction is unpersuasive.
The government’s reliance on the example of perjury serves it no better. It is true that perjury does not involve, or does not exclusively involve, an identifiable victim. As noted, when a perjurous statement is uttered, not only the processes, but also the integrity of the judicial system is thought to be harmed. Holland, 22 F.3d at 1047 (“Perjury, regardless of the setting, is a serious offense that results in incalculable harm to the functioning and integrity of the legal system as well as to private individuals.”). But an analogy to perjury statutes cannot support the Stolen Valor Act either.
The proscription of perjurous statements is limited to a very specific setting — testimony under oath in judicial or other legal proceedings, where the ascertainment of truth is critical to the administration of justice. See In re Michael, 326 U.S. 224, 227, 66 S.Ct. 78, 90 L.Ed. 30 (1945) (“All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore it cannot be denied that it tends to defeat the sole ultimate objective of a trial.”). Moreover, liability for perjury requires that the falsely asserted fact relate to a material matter. See 18 U.S.C. § 1621(1); Model Penal Code § 241.1; 4 Blackstone, *1192 supra, at *137 (“[The perjurous statement] must be in some point material to the question in dispute; for if it only be in some trifling collateral circumstance, to which no regard is paid, it is no[t] ... penalized].... ”). Materiality means that a false utterance has an actual or potential adverse effect on the proceeding. See Model Penal Code § 241.1(2) (“Falsification is material ... if it could have affected the course or outcome of the proceeding.”). The materiality requirement of perjury law ensures that liability will not be imposed for a false statement of fact — even one knowingly made, with an intent to deceive — unless there be actual harm or a significant risk of it.[20] The are no similar factors restricting the universe of statements that may be criminalized under the Stolen Valor Act.
D.
In sum, the Stolen Valor Act does not adequately train its gaze on the injurious falsehood. The Act’s simple and expansive wording ensures that a false representation — no matter how trivial it is — is punishable, without a showing of injury, or a significant risk of it. More specifically, the Act does not require a showing that a defendant’s false statement of fact caused a particular injury; it is not designed in a manner that is calculated to target any form of indirect injury; and the government’s argument that the false claims that the Act criminalizes inflict a generalized harm on the “reputation and meaning” of military awards is unpersuasive.
VI.
Because in my view the Stolen Valor Act does not benefit from a categorical exception to the First Amendment, it seeks to regulate protected speech. Moreover, because the Act punishes “false[] representations]” of having received a military medal, it restricts speech based on its content and subject matter, see Consol. Edison, 447 U.S. at 536, 100 S.Ct. 2326, and based on disapproval of “the message it conveys,” Hill, 530 U.S. at 719, 120 S.Ct. 2480 (quoting Ward, 491 U.S. at 791, 109 S.Ct. 2746) (internal quotation marks omitted). Accordingly, the Act must be subjected to strict scrutiny. See Brown, 131 S.Ct. at 2738.
To weather this exacting standard, the Act must be “justified by a compelling government interest” and be “narrowly drawn to serve that interest.” Id. (citing R. A.V., 505 U.S. at 395, 112 S.Ct. 2538). In addition, the Act must be “actually necessary” to achieving the government’s objectives. Id.; see R.A.V., 505 U.S. at 395, 112 S.Ct. 2538. It must be, in other words, the “least restrictive means to further the articulated interest.” Sable Commc’ns of Cal, Inc. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989). The presence of an adequate, less speech-restrictive alternative will render the Act constitutionally dubious, “casting considerable doubt on the government’s protestations that the asserted justification is in fact an accurate description of the purpose and effect of the law.” R.A.V., 505 U.S. at 395, 112 S.Ct. 2538 (quoting Burson v. Freeman, 504 U.S. 191, 213, 112 S. Ct. 1846, 119 L.Ed.2d 5 (1992)) (internal *1193 quotation marks omitted); accord Reno, 521 U.S. at 874, 117 S.Ct. 2329 (“Th[e] burden on ... speech is unacceptable if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve”).
It is axiomatic that we may affirm a district court’s judgment on any ground supported by the record. See United States v. Sandia, 188 F.3d 1215,1217 (10th Cir.1999) (“[W]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.” (alteration in original) (quoting Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1495 n. 1 (10th Cir.1992)) (internal quotation marks omitted)); see also EEOC v. C.R. England, Inc., 644 F.3d 1028, 1043 n. 14 (10th Cir.2011) (“[W]e ultimately affirm on an alternate ground supported by the record.”). Unlike the district court, I would not definitively opine on whether the Stolen Val- or Act seeks to vindicate compelling governmental interests because under my view, even assuming that it does, the government cannot prevail. I would conclude that the Act is neither narrowly tailored to the asserted interests nor necessary to achieve them. Accordingly, I would find the Act unconstitutional and would affirm the district court’s dismissal of the information against Mr. Strandlof.
A.
The long-form title of the Stolen Valor Act and the accompanying congressional findings offer insight into the Act’s purpose. It is entitled, in full, “An Act [t]o amend title 18, United States Code, to enhance protections relating to the reputation and meaning of the Medal of Honor and other military decorations and awards, and for other purposes.” See Pub.L. No. 109^37, 120 Stat. 3266, 3266 (2006). Section 2 of the Act contains the findings of Congress, including that “[fjraudulent claims surrounding the receipt of [military decorations and medals] ... damage the reputation and meaning of such decorations and medals” and that “[[legislative action is necessary to permit law enforcement officers to protect the reputation and meaning of military decorations and medals.” Id, § 2.
In its briefs, the government offers two justifications for the Act. Echoing Congress’s findings, it states first that “[t]he government has an important interest in protecting the reputation and value of military honors.” Aplt. Opening Br. at 22. In this vein, it notes that “the government’s ability to bestow public honor on an extraordinary few is undermined if, because of a multitude of imposters and false claims, people come to doubt that anyone’s claims are true” and that “the government’s expressions of gratitude to a distinguished few by means of a medal may appear insincere if the government does nothing to prevent liars and fraudsters from stealing the honor that belongs exclusively to the true recipients of the award.” Id. Second, we are told that Congress has an “interest in protecting the public from being deceived by imposters seeking to take advantage of the respect and credibility that military awards confer.” Aplt. Reply Br. at 17; see also Aplt. Opening Br. at 24 (“Congress also has an interest in protecting the public from the attempts of military imposters to misappropriate the benefits and privileges of having received a military honor.”).[21]
*1194 I assume without deciding that these interests are compelling ones. “It is not the [government’s] ends, but its means, to which [I] object.” Johnson, 491 U.S. at 418, 109 S.Ct. 2533. In my analysis below, I follow the Supreme Court’s lead and evaluate the government’s articulated interests separately as they relate to the challenged statute. See id. at 407-11, 109 S.Ct. 2533; Aria. Free Enter. Club’s Freedom Club PAC v. Bennett, — U.S.-, 131 S.Ct. 2806, 2824-28, 180 L.Ed.2d 664 (2011); Sorrell v. IMS Health, Inc., — U.S. -, 131 S.Ct. 2653, 2668-72, 180 L.Ed.2d 544 (2011). I conclude (1) that with respect to the government’s interest in protecting the “reputation and value of military honors,” the government has failed to show that the Act is the least restrictive means of effectuating that interest, and (2) that with respect to the government’s interest in protecting the public from imposters who “take advantage of the respect and credibility that military awards confer,” the Act is significantly overinclusive and thus not narrowly tailored to alleviating the alleged harm.
B.
The government’s first claimed interest is in protecting the reputation and status of military decorations — specifically, as symbols of honor, public esteem, and military merit, the reserve of a “distinguished few” who have risked and often sacrificed their lives on the nation’s behalf. See Aplt. Opening Br. at 22. Assuming, arguendo, that this interest is a compelling one,[22] I would hold that the government has not carried its burden to show that a criminal prohibition on false claims of military honor (even claims knowingly made with an intent to deceive) is the least restrictive means of furthering that interest.
Content-based restrictions on speech must be the “least restrictive means” available to the government. Sable Commc’ns, 492 U.S. at 126, 109 S.Ct. 2829. “If a less restrictive alternative would serve the Government’s purpose, the legislature must use that alternative.” Playboy Entm’t, 529 U.S. at 813, 120 S.Ct. 1878. Mr. Strandlof posits that such an alterna *1195 tive is available here: that is, publication by the government of lists of true recipients of military honors in order to facilitate public exposure of imposters. See Aplee. Corr. Br. at 62. He points in particular to a government website listing all Medal of Honor recipients from 1863 to the present. See U.S. Army Center of Military History, Medal of Honor, http:// www.history.army.mil/moh.html (last visited Jan. 6, 2012).
I find Mr. Strandlofs argument to be persuasive. The Supreme Court has often told us that “more speech, not enforced silence” is the “preferred First Amendment remedy.” Hartlage, 456 U.S. at 61, 102 S.Ct. 1523 (quoting Whitney v. California, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring)) (internal quotation marks omitted); see also Johnson, 491 U.S. at 419, 109 S.Ct. 2533 (“If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence.” (quoting Whitney, 274 U.S. at 377, 47 S.Ct. 641 (Brandéis, J., concurring)) (internal quotation marks omitted)).[23] That remedy in this ease was potent. When Mr. Strandlofs prevarications were revealed, he quickly went “from hero to pariah,” Aplee. Br. at 62, and the record is replete with newspaper articles excoriating Mr. Strandlof for his deception, see ApltApp. at 41-68. Moreover, it was the community who exposed Mr. Strandlofs lies, after members of the organization he founded, the Colorado Veterans Alliance, became suspicious of his claims, searched military records, and contacted the FBI. Id. at 57.
In fact, there is a robust and nationwide grassroots effort aimed at rooting out imposters like Mr. Strandlof. See Amy Chozick, Veterans’ Web Sites Expose Pseudo Heroes, Phony Honors, Wall St. J., May 6, 2005, at Bl. For example, the website POWnetwork.org maintains an extensive list of individuals making false claims of military service and decoration. P.O.W. Network’s Phonies Index, P.O.W. Network, http://pownetwork.org/phonies/ list_of_names.htm (last visited Jan. 6, 2012). More notable perhaps is the “Hall of Valor,” a website maintained by Vietnam veteran Doug Sterner. Hall of Valor, Military Times Hall of Valor, http://www. militarytimes.com/citations-medals-awards/ (last visited Jan. 6, 2012). The American veterans’ organization, AMVETS, calls the site “the most comprehensive database of military valor award citations available.” See The Case for HR 666: The Military Valor Roll of Honor Act, Report StolenValor.org, http://www.reportstolenvalor.org (last visited Jan. 6,2012).
‘When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government’s obligation to prove that the alternative will be ineffective to achieve its goals.” Playboy Entm’t, 529 U.S. at 816, 120 S.Ct. 1878. The government, in my view, has not carried its burden here. It first asserts that, “[a]s reflected in Congress’s finding in *1196 support of the Act, the remedy of “more speech’ has proven to be an insufficient deterrent to prevent false claims of military awards.” Aplt. Opening Br. at 31. But the congressional findings in Section 2 of the Act contain no such conclusion. There is nothing in the legislative record suggesting that Congress even considered alternative mechanisms of combating false claims, much less concluded that such mechanisms were ineffective. See Sable Commc’ns, 492 U.S. at 126, 129, 109 S.Ct. 2829 (finding that a statute was not “narrowly drawn” so as to satisfy the First Amendment because “the congressional record contains no legislative findings that would justify us in concluding that there is no constitutionally acceptable less restrictive means, short of a total ban, to achieve the Government’s interest”).
The government also suggests that a government database of award recipients would be inadequate because database records might be unclear and imposters may do significant harm before their lies are exposed. See Aplt. Opening Br. at 31. However, this argument says nothing about whether the publication of lists of true award recipients would be equally as effective as (and perhaps even more effective than) criminal sanctions at deterring false claims, or nipping them in the bud when they appear. Indeed, the government merely muses that “it is not at all clear that such a database would be as effective as criminal penalties in preventing false claims.” Aplt. Reply Br. at 18 n.8. However, the government carries the burden of proof on the least-restrictive-means inquiry- and such empty musings— which, at most, suggest the possibility that a database would not be as effective as criminal sanctions — are not sufficient to carry its burden. Without more, and particularly in light of the growing universe of online military-award lists, I am not persuaded that “more speech” is not an adequate alternative to achieve the government’s interest in preserving the reputation and meaning of military honors.
I would stress the narrowness of this conclusion. Congress might very well determine that the proposed database alternative is an inadequate remedy to what Judge Bybee has termed the “epidemic” of military imposters, Alvarez, 617 F.3d at 1239 (Bybee, J., dissenting), and that a criminal penalty is in fact necessary to combat false claims and preserve the reputation and status of military awards. Those judgments would be entitled to considerable weight by the courts, see Turner Broad. Sys., Inc. v. F.C.C., 520 U.S. 180, 195-96, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), particularly in light of Congress’s traditionally broad legislative authority over military affairs, see United States v. O’Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (“The constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping.”).[24] On the present record, however, I *1197 believe the government has failed to make the required showing.
C.
The government also asserts an interest in “protecting the public from being deceived by imposters seeking to take advantage of the respect and credibility that military awards confer.” Aplt. Reply Br. at 17. To the extent that the government is articulating an interest in combating fraud — for example, preventing a defendant from deriving a distinct material benefit, or from perpetrating through reliance a distinct harm, by his false claim — this is plainly an interest that would justify a criminal penalty, as the history and continued existence of criminal fraud laws suggests. See Telemarketing Assocs., 538 U.S. at 612-13,123 S.Ct. 1829 (stating that “fraud[ ] ... is unprotected speech,” that “fraud prevention ranks as a substantial governmental interest,” and that “[fjrauds ... may be denounced as offenses and punished by law” (alteration omitted) (quoting Village of Schaumburg v. Citizens for a Better Env’t, 444 U.S. 620, 636, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980), and Schneider v. Town of Irvington, 308 U.S. 147, 164, 60 S.Ct. 146, 84 L.Ed. 155 (1939)) (internal quotation marks omitted)); Donaldson, 333 U.S. at 190, 68 S.Ct. 591 (the government’s power “to protect people against fraud” has “always been recognized in this country and is firmly established”).
In part, the Stolen Valor Act seems to have been enacted with fraud in view. See 151 Cong. Rec. S12684-01, S12688 (Nov. 10, 2005) (statement of Sen. Conrad) (“These imposters use fake medals — or claim to have medals that they have not earned — to gain credibility in their communities. These fraudulent acts can often lead to the perpetration of very serious crimes.”); id. at S12689 (“We must never allow [recipients’] service and sacrifice to be cheapened by those who wish to exploit these honors for personal gain.”). And newly proposed legislation in Congress, dubbed the Stolen Valor Act of 2011, is calibrated to that purpose, criminalizing misrepresentations of military honor made knowingly and “with intent to obtain anything of value” that is of more than “de minimis” worth. Stolen Valor Act of 2011, H.R. 1775, 112th Cong. § 2(a) (2011), available at http://heck.house.gov/sites/ heck.house.gov/files/Stolen% 20Valor% 20Bill.pdf.
The problem for the government, however, is that the Stolen Valor Act is not a narrowly tailored effort to combat fraud. Even when the government pursues permissible ends, if the means impinge on First Amendment rights, then they must be “neither seriously underinclusive nor seriously overinclusive.” Brown,, 131 S.Ct. at 2741^12. The Act, in my view, suffers a serious overinclusiveness problem. By its terms, the Act has no mens-rea requirement at all, much less one that is narrowly tailored to attack fraud. Even assuming, arguendo, that the majority’s limiting construction of the Act is permissible — such that the statute’s reach is restricted to *1198 false statements that are knowingly made, with an intent to deceive — the Act still does not require the government to prove that the defendant uttered the false statement with the intent to secure reliance— for example, with the intent to obtain something of more than a de minimis value, as found in the proposed Stolen Valor Act of 2011. Therefore, I am hard-pressed to see how the Act realistically could operate to combat fraud. Cf. Telemarketing Assocs., 538 U.S. at 620-21, 123 S.Ct. 1829 (describing elements of fraud under state law, including a knowingly false statement made “with the intent to mislead the listener, and succeeded in doing so” as “[exacting proof requirements” that “provide[d] sufficient breathing room” for the First Amendment and were “properly tailored” to the government’s interest in fraud prevention (emphasis added)); Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924) (“[The words ‘to defraud’] usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching.”). Furthermore, I do not believe it would be appropriate to employ the doctrine of constitutional avoidance to read an intent-to-defraud element into the Act, because it is not “readily susceptible” to such a saving construction. Stevens, 130 S.Ct. at 1592 (quoting Reno, 521 U.S. at 884, 117 S.Ct. 2329) (internal quotation marks omitted). Not even the majority suggests that this would be appropriate. And, in more statutes than I could reasonably catalog, when Congress meant to include the mensrea element of intent to defraud, it did so in express terms. See, e.g., 18 U.S.C. § 38(a)(1)(A) (“intent to defraud” regarding “any aircraft or space vehicle part”); id. § 152(1) (“knowingly and fraudulently conceals ... any property belonging to the estate of a debtor” in bankruptcy proceedings); id. § 471 (“intent to defraud” regarding “any obligation or other security of the United States”). Thus, the absence in the Stolen Valor Act of a mens-rea requirement narrowly tailored to attack the fraud that may arise from false claims relating to military awards “is alone enough to defeat it.” See Brown, 131 S.Ct. at 2740.
D.
The Stolen Valor Act does not survive strict scrutiny. The government has failed to show that a criminal penalty is the least restrictive means of achieving its interest in protecting the symbolic importance of military awards. Furthermore, the Act is not a narrowly tailored effort at fraud prevention: by its terms it contains no mens-rea requirement at all and the one that the majority purports to engraft onto the statute does not succeed in making the Act narrowly tailored to combat fraud.
Based on the Supreme Court’s false-statement jurisprudence, the historical record, and bedrock First Amendment principles, I dissent from the majority’s opinion and would hold that the injurious falsehood is the “historic and traditional categorfy],” Stevens, 130 S.Ct. at 1584 (quoting Simon & Schuster, 502 U.S. at 127, 112 S.Ct. 501) (Kennedy, J., concurring in the judgment) (internal quotation marks omitted), that warrants a categorical exception to the First Amendment’s rigorous, protective requirements. The Stolen Valor Act, in my view, does not qualify for the exception because it does not target those falsehoods that cause, or pose a significant risk of causing, injury — whether that injury be to individuals or to governmental processes. Being a content-based restriction on speech, the Act therefore must survive strict scrutiny, which it fails to do. The government has not adequately justified the need for a criminal prohibition to effectuate its interest in protecting the symbol *1199 ic importance of military awards, and the Act is not a narrowly tailored effort at fraud prevention because it lacks a mensrea requirement that would advance this objective. I would therefore affirm the district court’s order striking down the Stolen Valor Act as an unconstitutional abridgment of the freedom of speech.

. On December 14, 2009, the government filed an amended information charging Mr. Strandlof with a “knowing” violation in each of the five counts.

. Because it found that the Stolen Valor Act was unconstitutional on this ground, the district court declined to consider Mr. Strandlof's further argument that the statute was not narrowly tailored. See Strandlof 746 F.Supp.2d at 1189.

. Several other statutes, punishing fraudulent acts as opposed to pure speech, also require both knowledge of falsity and intent to deceive. See, e.g., 10 U.S.C. § 923a; 18 U.S.C. § 716; 18 U.S.C. § 2252B(a)-(b); 18 U.S.C. § 2252C(a)-(b); 42 U.S.C. § 408(a)(7)(A).

. Weems’s biography first appeared in 1800. He added the cherry-tree anecdote in the fifth edition, published in 1806. Lyrissa Barnett Lidsky, Authorship, Audiences, and Anonymous Speech, 82 Notre Dame L.Rev. 1537, 1561 n.127 (2007).

. The majority’s limiting construction is further problematic because it places upon the speaker the burden of showing that his speech — knowingly false and intentionally deceptive as it is — is in fact satirical, literary, artistic or hyperbolic. As with the "breathing space" review that the majority employs (which I shall address later), this flips customary First Amendment analysis on its head.

. See Brown, 131 S.Ct. at 2733 (obscenity, incitement, and fighting words); Stevens, 130 S.Ct. at 1584 (obscenity, defamation, fraud, incitement, and speech integral to criminal conduct); R.A. V. v. City of St. Paul, 505 U.S. 377, 383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (obscenity, defamation, and fighting words); Simon & Schuster, 502 U.S. at 127, 112 S.Ct. 501 (Kennedy, J., concurring in the judgment) (obscenity, defamation, incitement, and "situations presenting some grave and imminent danger [that] the government has the power to prevent”); Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 n. 5, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality opinion) (obscenity, fighting words, advocating the violent overthrow of the government, publication of troopship sailings during wartime); Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 504, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (libelous speech, fighting words, incitement to riot, obscenity, and child pornography); Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 592-93, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (Rehnquist, J., dissenting) (fighting words, group libel, obscenity, defamation, and false and misleading commercial speech); Chaplinsky, 315 U.S. at 572, 62 S.Ct. 766 (referencing "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words”).

. See Illinois ex rel. Madigan v. Telemarketing Assocs., Inc., 538 U.S. 600, 612, 123 S.Ct. 1829, 155 L.Ed.2d 793 (2003) C'[T]he intentional lie is no essential part of any exposition of ideas.” (quoting Gertz, 418 U.S. at 340, 94 S.Ct. 2997) (internal quotation marks omitted)); BE &K Constr. Co. v. NLRB, 536 U.S. 516, 531, 122 S.Ct. 2390, 153 L.Ed.2d 499 (2002) (”[F]alse statements ... [are] unprotected for their own sake.... ”); Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 52, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) ("False statements of fact are particularly valueless... ."); Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 776, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) ("There is 'no constitutional value in false statements of fact.’ ” (quoting Gertz, 418 U.S. at 340, 94 S.Ct. 2997)); Herbert v. Lando, 441 U.S. 153, 171, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) ("Spreading false information in and of itself carries no First Amendment credentials.”); Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) (“Untruthful speech, commercial or otherwise, has never been protected for its own sake.”); Time, Inc. v. Firestone, 424 U.S. 448, 457, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976) ("[I]naccurate and defamatory reports of facts [are] matters deserving no First Amendment protection____”); Gertz, 418 U.S. at 340, 94 S.Ct. 2997 ("[T]here is no constitutional value in false statements of fact.”); Time, Inc. v. Pape, 401 U.S. 279, 292, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) ("Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation.” (quoting St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)) (internal quotation marks omitted)); Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.”); see also Brown v. Hartlage, 456 U.S. 45, 60, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982) ("[Demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements.”)

. See also Falwell, 485 U.S. at 52, 108 S.Ct. 876 (“False statements of fact are particularly valueless ... [because] they cause damage to an individual's reputation....”); Greenmoss Builders, Inc., 472 U.S. at 762, 105 S.Ct. 2939 (“[N]o special [First Amendment] protection [applies] when ... speech is wholly false and clearly damaging to the victim’s business reputation.’’); Keeton, 465 U.S. at 776, 104 S.Ct. 1473 ("False statements of fact harm both the subject of the falsehood and the readers of the statement.” (emphasis omitted)); Herbert, 441 *1178 U.S. at 172, 99 S.Ct. 1635 (“Those who publish defamatory falsehoods ... are subject to liability....” (emphasis added)); Time, Inc. v. Hill, 385 U.S. at 384 n. 9, 87 S.Ct. 534 (recognizing state interest in providing recovery for false light invasion of privacy because “the primary damage is the mental distress from having been exposed to public view”).

. However, I recognize that this is not a hard and fast rule. Historic regulation of a category of speech is neither necessary, see New York v. Ferber, 458 U.S. 747, 763-64, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), nor sufficient, see Cohen v. California, 403 U.S. 15, 19-20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), for the category’s continued canonical status. See Simon & Schuster, 502 U.S. at 127, 112 S.Ct. 501 (Kennedy, J., concurring in the judgment) (listing various categories and stating that "it cannot be said with certainty that the foregoing types of expression are or will remain the only ones that are without First Amendment protection”).

. A false token is "a false document or sign of the existence of a fact, in general, used for the purpose of fraud.” Black's Law Dictionary 603 (6th ed.1990); see also Black’s Law Dictionary 1625 (9th ed.2009) (defining "false token” as "[a] counterfeit coin, bill, or the like”).

. See also State v. Newell, 1 Mo. 248, 1822 WL 1474, at *2 (1822) (“If a man tells a positive lie, the fact of lying, alone, is not a pretense within the statute; but the moment he uses that lie to effect an object to the disadvantage of another, it is a false pretense.”); State v. Wilson, 9 S.C.L. (2 Mill Const.) 135, 1818 WL 753, at *1-2 (S.C.Const. Ct.App.1818) (criticizing an indictment for false representation in the sale of a slave for alleging that the defendants’ statements were "falsely” asserted because this did not amount to an allegation of mens rea, and stating, "[t]he assertion, then, was only false because it was not true, to which neither moral nor legal guilt can attach”; and further holding that because the false representation did not occur by a false token, it was "but a naked lie, and however reprehensible, is not indictable”).

. See also Green’s Adm’rv. Bryant, 2 Ga. 66, 1847 WL 1240, at *2 (1847) (holding that defendant’s false statement was not a "naked lie” and was therefore actionable because defendant “knew better than the plaintiff what ... [the truth was]; the representation was wilfully false; it was made for his, the defendant’s, benefit; he was interested in it; [and] by it he pocketed some five hundred dollars of the plaintiffs money" (emphasis added)); Benton v. Pratt, 2 Wend. 385, 390 (N.Y.Sup. Ct.1829) (holding that a false representation was not a "bare, naked lie” and was actionable because there was "the assertion, on the part of the defendant, of an unqualified falsehood, with a fraudulent intent as to a present or existing fact, and a direct, positive and material injury resulting therefrom to the plaintiff”); Farrar v. Alston, 12 N.C. (1 Dev.) 69, 1826 WL 267, at * 1 (1826) ("When no loss is occasioned by a falsehood, an action for a deceit will not lie.... ”); Lang v. Lee, 24 Va. (3 Rand.) 410, 1825 WL 954, at *6 (1825) ("Fraud without damage, or damage without fraud, gives no cause of action; but where these two do concur, there, an action lieth.” (citation omitted) (internal quotation marks omitted)); Otis v. Raymond, 3 Conn. 413, 1820 WL 30, at *4 (1820) ("To sustain the action ... [for fraudulent misrepresentation of facts], there must have been a fraud committed by the [defendant], and damages resulting from it to the [plaintiff].”); Pasley v. Freeman, (1789) 100 Eng. Rep. 450, 453 (K.B.) (Buller, J.) ("[A]n action cannot be supported for telling a bare naked lie; but that I define to be, saying a thing which is false, knowing or not knowing it to be so, and without any design to injure, cheat, or deceive, another person. Every deceit comprehends a lie; but a deceit is more than a lie on account of the view with which it is practised, it's [sic] being coupled with some dealing, and the injury which it is calculated to occasion, and does occasion, to another person.”); cf. Moore v. Turbeville, 5 Ky. (2 Bibb) 602, 1812 WL 644, at *1 (1812) ("That a misrepresentation or suggestion of a falsehood with respect to a fact of this kind, whereby another is deceived, is a violation of good faith, and consequently a deviation from the rules of moral rectitude, must be admitted. It however does not necessarily follow, that it is sufficient to induce a right of action. There are many instances in which a person may be guilty of a moral delinquency, without incurring a[]legal responsibility; for[]legal obligations are necessarily more circumscribed in their nature than moral duties.”).

. See also Sheffill v. Van Deusen, 79 Mass. (13 Gray) 304, 304-05 (1859) ("No ... injury is done when the words are uttered only to the person concerning whom they are spoken .... It is damage done to character in the opinion of other men, and not in a party’s self-estimation [sic], which constitutes the material element in an action for verbal slander.”); McIntosh v. Matherly, 48 Ky. (9 B. Mon.) 119, 1849 WL 5393, at *1 (1848) ("The injury to the plaintiff's character in public estimation, is the basis of the action [for slander]. If the slander is not published or made known to others, his character cannot be affected by it, and a suit of slander for the private injury cannot be maintained[.]”).

. Viewed from this historical perspective, the majority's listing of federal statutes that currently criminalize the making of false factual statements is hardly remarkable. See Maj. Op. at 1164-66. These statutes generally resemble those that were in existence around the time that the First Amendment was adopted — statutes that proscribe speech causing an injury, or posing a significant risk of doing so, to governmental processes. Contrary to the majority’s suggestion, id. at 1165 (‘'[T]he Stolen Valor Act does not stand alone.”), the existence of these statutes does not dispel the idea that the Stolen Valor Act is an outlier in that it proscribes false factual statements that have no necessary nexus at all to an injury or to a significant risk of one — be it to an individual or to government processes.

. It bears mention that under the rule the majority lays out, it would not be enough even to show that an uttered falsehood is itself of sufficient social importance. The false statement, we are told, is never protected for its own sake. Thus, for example, it would not be enough for a speaker to show that telling a lie in a given circumstance was necessary to save a person’s life or to preserve the speaker's privacy. Protection of that kind of lie ordinarily would not be necessary to protect other speech that matters, and the speaker could be made to answer criminally. Perhaps there are theories under which the speaker could escape punishment. But one thing is clear: he could not count on his speech being protected.

. The majority's attempt to side-step this point is entirely unpersuasive. The majority asserts that breathing space analysis is "not a balancing test in any ordinary sense” but rather is "more aptly characterized as a specific method of review the Court uses to assess laws regulating false factual statements,” which is allegedly akin to strict scrutiny and the other forms of review applied in the constitutional arena. Maj. Op. at 1163. However, the majority cites to no legal authority to validate this characterization of its breathing space analysis. Moreover, we are left to wonder under the majority's posited breathing space review what legal principles courts should employ in determining what speech matters and, perhaps more perplexing, how much breathing space is enough. Indeed, notwithstanding the majority's protestations, it is clear that its breathing space review actually contemplates a balancing test: courts must determine what speech matters (i.e., balancing the speech at issue against other forms of speech), and presumably depending on how important they determine that speech to be, decide how much breathing space is necessary.

. Thus, as well-intentioned as they may be, the majority's suggestion that the public should take comfort in the fact that "the judiciary will continue to scrutinize arbitrary and irrational legislative enactments,” and its assurance that the public generally may rely on legislators' "judgment ... [to] refrain from enacting outrageous laws that encroach upon the ability of the individuals to voice their opinions, converse with fellow citizens, and go about their lives,” Maj. Op. at 1155 n. 6, effectively ignore the fundamental mistrust of government that animates the restrictions of the First Amendment.

. The majority's attempt to demonstrate that its breathing space analysis extends beyond the defamation context is wholly unpersuasive. Specifically, the majority asserts: "[M]ost importantly, these [breathing space] principles extend well beyond the narrow context of defamation.” Maj. Op. at 1161. And then it offers a string-cite that supposedly establishes this point. However, it is significant that overwhelmingly the cases that the majority cites involve restrictions on injurious speech — speech that actually injures, or that poses a significant risk of injuring, certain individuals, or governmental processes: that is, speech involving fraud, false-light invasion of privacy, intentional infliction of emotional distress through false statements, trade libel, falsehoods that are likely to lead to physical harm, falsehoods that are likely to provoke a public panic — i.e., harm to individuals; and speech involving perjury, unsworn false statements of fact made to governmental officials, false statements regarding university degrees and professional licenses, falsehoods in connection with political campaigns — i.e., harm to governmental processes. Generally speaking, I do not dispute that such injurious speech has historically been subject to governmental regulation. However, the proscriptions of the Stolen Valor Act sweep much more broadly than these laws to reach false statements of fact about military medals that neither cause nor threaten any actual harm at all. Indeed, as the majority notes: “Under the plain terms of the Act ... [i]t is inconse *1187 quential whether the lie induced reliance or caused discrete harm.” Id. at 1154. Similarly, the six contexts to which the majority suggests that the Supreme Court has extended breathing space principles either "expressly or implicitly,” id. at 1161, reflect harm to persons or threatened harm to governmental processes. Accordingly, I do not find persuasive the majority’s attempt to demonstrate that its Geriz-based breathing space analysis extends beyond the context of injurious falsehoods, like defamation.

. I note that Chaplinslcy hints at this distinction between the directly and the indirectly injurious when it describes the categories of unprotected speech as "those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.” 315 U.S. at 572, 62 S.Ct. 766 (emphasis added).

. Consequently, the majority's attempt to liken the Stolen Valor Act to perjury statutes, see Maj. Op. at 1165, is unavailing: the statutes that the majority cites, 18 U.S.C. §§ 1621 and 1623, both have materiality elements. Furthermore, the majority’s suggestion that perjury allows for the criminalizing of false statements, “even if there is no harm to the tribunal or inquiry," Maj. Op. at 1165, overlooks the fact that, irrespective of whether the tribunal or inquiry is actually misled by the perjurer’s false statements, those statements have directly harmed the integrity of the judicial system.

. The government has abandoned its argument before the district court that “[djiluting the meaning or significance of medals of hon- or ... could impact the motivation of soldiers to engage in valorous, and extremely dangerous, behavior on the battlefield.” See Strand *1194 lof, 746 F.Supp.2d at 1190 (alteration in original) (quoting Gov’t Resp. to Amicus Br. of Rutherford Inst, at 12 (Dist.Ct.Dkt.# 31-3)) (internal quotation marks omitted). As with the interests that the government does pursue on appeal, I offer no definitive opinion on whether this interest is in fact compelling.

. The Supreme Court has recognized both the significance of national symbols and the government’s interest in protecting them:
It cannot be gainsaid that there is a special place reserved for the flag in this Nation, and thus we do not doubt that the government has a legitimate interest in making efforts to preserve the national flag as an unalloyed symbol of our country. We reject the suggestion, urged at oral argument ..., that the government lacks any state interest whatsoever in regulating the manner in which the flag may be displayed. Congress has, for example, enacted precatory regulations describing the proper treatment of the
flag, see [4 U.S.C. §§ 5-9], and we cast no doubt on the legitimacy of its interest in making such recommendations.
Johnson, 491 U.S. at 418, 109 S.Ct. 2533 (alteration omitted) (citations omitted) (quoting Spence v. Washington, 418 U.S. 405, 412, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), and Tr. of Oral Arg. at 38) (internal quotation marks omitted). Protecting the integrity of military honors has been of central concern to our government and its leaders since the earliest days of the Republic. See General Orders of George Washington 30 (Newburgh, E.M. Ruttenber & Son 1883) (Order of Aug. 7, 1782) ("Should any who are not entitled to the [military] honors, have the insolence to assume the badges of them, they shall be severely punished.”). The Ninth Circuit concluded that the Stolen Valor Act was justified by Congress’s "noble” and compelling interest in "preserving the integrity of its system of honoring our military men and women for their service and, at times, their sacrifice.” Alvarez, 617 F.3d at 1216.

. Indeed, the Supreme Court has suggested in a number of cases that the First Amendment requires greater tolerance of falsehood, even injurious falsehood, when the marketplace of ideas is adequate for the correction of error. See, e.g., Whitney, 274 U.S. at 377, 47 S.Ct. 641 (Brandéis, J., concurring). The Court has often resorted to this principle explicitly. In Hartlage, for example, the Court struck down a state law prohibiting false promises in the course of an election campaign. 456 U.S. at 61, 102 S.Ct. 1523. It found that "[t]he preferred First Amendment remedy of 'more speech, not enforced silence,’ ” had "special force" in this context because "[i]n a political campaign, a candidate’s factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent.” Id.

. In this regard, in a footnote in its reply brief, Aplt. Reply Br. at 18 n. 8, the government points to a 2009 Department of Defense report to Congress that recommended against the kind of database that Mr. Strandlof proposes on the ground that such a database would be insufficiently complete and of limited utility because federal law would prohibit publication of certain identifying information about true award recipients. See Report to the Senate and House Armed Services Committees on a Searchable Military Valor Decorations Database (March 2009), available at http://www.reportstolenvalor.org/pdf7DoDDB-Report-04-02-2009.pdf.
Putting aside the fact that any line of argument predicated on this report would come too late because the government did not reference it until its reply brief, see, e.g., United States v. Abdenbi, 361 F.3d 1282, 1289 (10th Cir.2004) (“The failure to raise an issue in an opening brief waives that issue.”); Carpenter *1197 v. Boeing Co., 456 F.3d 1183, 1198 n. 2 (10th Cir.2006) (noting that "we particularly frown on the making of new arguments in a party's reply brief”), the government does not assert that, at any time, Congress has affirmatively endorsed the report’s recommendation— which was issued, in any event, after the passage of the Stolen Valor Act — and, therefore, the report’s recommendation under no circumstances should be accorded the level of deference in our present analysis that we have customarily extended to congressional findings. The report's recommendation is not of sufficient persuasive force to alter our conclusion here regarding the government’s failure to carry its burden in the least-restrictive-means analysis.